**BAKELITE THERMOSETS, LTD., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Court No. 87–06–00746.**

U.S. Court of
International Trade.

June 28, 1990.

---

Barnes, Richardson & Colburn, James S. O'Kelly, Sandra Liss Friedman, New York City, for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Saul Davis, New York City, Civ. Div., U.S. Dept. of Justice, and Edward I. Maurer, New York City, United States Customs Service, for defendant.

## OPINION

RESTANI, Judge:

This action is before the court for decision following trial. The product at issue is an asphalt-wax emulsion which is used in making water repellant gypsum board. The product is known as Bakelite No. 52X. Customs classified No. 52X as "Mineral substances, and articles of mineral substances, not specially provided for: Other: Not decorated," under item 523.91, of the Tariff Schedules of the United States (TSUS) (1984). Plaintiff claims that the correct classification is under item 521.11, TSUS, "Asphaltum, bitumen, and limestone-rock asphalt."

The issue before the court is whether No. 52X is a form of asphalt, even though "improved," or whether it is a new article produced from combining asphalt and other ingredients.

## FACTS

The parties agreed in the Pretrial Order on this matter that No. 52X is a liquid, consisting of forty-five percent asphalt, forty-five percent water, eight percent petroleum wax and two percent emulsifiers and stabilizers. There appears to be agreement between the parties that the water component is irrelevant to classification. There also appears to be agreement that the emulsifiers and stabilizers do not take the product out of the "asphaltum" classification. Rather, the essential dispute is whether the eight percent wax component makes No. 52X more than or other than a form of asphalt.

The parties also agreed in the Pretrial Order that most commercially used asphalt is derived from petroleum.[1] The wax used in No. 52X is also a petroleum derivative. See TR 29–31. The wax is, however, more expensive by volume and weight than asphalt. TR 39–40. The parties agree that the asphalt and wax in No. 52X do not chemically combine, rather they are kept in emulsion until application. It is also undisputed that the emulsion at issue is a dispersion of fine particles in water.

No. 52X is mixed with a gypsum slurry so that the gypsum particles are coated to make the resulting gypsum board more water repellant. Apparently, the water in the emulsion is substantially evaporated and only the asphalt and wax remain thereafter as effective components of the finished board. TR 19–20, 212–14. Gypsum board consists of a hard core sandwiched between two paper liners; it is used as structural building panelling.

Asphalt is traditionally used as both a waterproofing and an adhesive agent. TR 50–51, 92, 175–76. It is apparent that the adhesive function aids the waterproofing function. Testimony revealed that neither wax nor asphalt alone efficiently or sufficiently waterproofs the gypsum board for commercial purposes. See TR 15–18, 158–59, 196–98, 257–60.[2] See also Plaintiff's Exhibit 4, United States Patent No. 2,432,-963, column 2, lines 22–27. ("The degree of water resistance ... is very much greater than that obtained when one uses either wax alone or the asphalt alone in emulsified form.") Although there was a lack of clarity as to the exact mechanical functioning of the asphalt and wax in No. 52X, the totality of the testimony and documentary evidence indicates that while the asphalt is important in waterproofing the gypsum particles, the wax also aids this process.

---

**1.** Naturally occurring asphalt deposits do not appear to be of relevance here.

**2.** Testimony that use of enough asphalt will sufficiently waterproof the board (TR 21) is not particularly helpful to resolution of this matter, as it was not shown that this is a commercially useful option.

Together the wax and asphalt waterproof the gypsum particles. *See id.* column 5 at lines 41–52; TR 92, 115, 213–17, 258–60. Therefore, the court finds based on the evidence presented by both parties that the wax performs an important permanent function in the waterproofing of the gypsum board and does not merely aid application of the asphalt particles to the gypsum as would an emulsifier.

There was testimony as to whether the wax should be considered a natural part of the asphalt. Apparently, asphalt does contain wax, and some asphalts may be so naturally waxy as, at least theoretically, to be capable of functioning as No. 52X does. TR 158–62. Apparently, Bakelite does not use such waxy asphalts or does not test for wax content. TR 47–48. Accordingly, wax is always added. TR 48. The eight percent wax in No. 52X, thus, is not a natural part of the asphalt used in No. 52X. TR 48–49. As indicated, the wax added to make No. 52X is of considerable value apart from the asphalt. It should be considered a separate petroleum product, not a naturally occurring part of the asphalt used in No. 52X.

There was also a great deal of testimony as to scientific and industry definitions of the term "asphalt emulsion." The term "asphalt emulsion" as used in everyday parlance in the industry seems to include almost any emulsion that is largely composed of asphalt. TR 250–52. Other definitions would seem to be more narrow. For example, *McGraw–Hill Dictionary of Scientific and Technical Terms* (3rd ed. 1984) (Defendant's Exhibit C (Def. Ex.)) defines asphalt emulsion as "[a]sphalt cement in water containing a small amount of emulsifying agent." *Id.* at 112. The definition in *Introduction to Asphalt* (4th ed., 1962) (Def. Ex. A), published by the Asphalt Institute does not differ significantly.[3] Bakelite's product information sheet does not describe No. 52X as simply an asphalt emulsion. *See* Plaintiff's Exhibit 1. No. 52X is described therein as a "[s]pecial-

ly designed emulsion of blended asphalt and wax...." *Id.*

It appears that any asphalt emulsion composed only of asphalt, water and small amounts of emulsifying agents would, for tariff purposes, fit within defendant's view of "asphaltum." The problem is that other emulsions, perhaps commonly referred to by the trade as "asphalt emulsions," contain additional components with specific permanent functions. TR 226–34. The emulsion at issue here is one such emulsion.

## DISCUSSION

Two cases involving similar products have been cited by the parties. The first is *United States v. Central Westrumite Co.,* 1 Ct.Cust.App. 400 (1911). The merchandise at issue in that case was a liquid form of asphalt which was "used as a binder for holding together rocks, gravel, and similar substances in the making of bitumen pavements." *Id.* at 401. Six percent of the merchandise was other than asphalt or water. *Id.* The additional chemicals were stated to evaporate as the asphalt hardened. *Id.* at 402. The court stated that "the chemicals and water are added solely for the purpose of combining the different classes of asphalt and bitumen and bringing them into that united form and condition that they may be as such readily applied and used as a binder of rocks, gravel, and other materials in the construction of asphalt or bitumen pavements...." *Id.* The court concluded that "the sole use of the imported merchandise is as an asphaltum and bitumen...." *Id.* at 403. As such the product was found to be asphalt advanced in condition. *Id.*

*Central Westrumite* is distinguishable from the case at hand because of the presence of wax in the product before the court. The wax does not simply aid combination and application as did the "chemicals" in *Central Westrumite,* or as do emulsifiers in the asphalt emulsions readily accepted as advanced forms of asphalt.

The view that emulsifiers simply enhance the asphalt product is supported by *Ameri-*

---

**3.** Contrary to plaintiff's contention, the Asphalt Institute's *A Basic Asphalt Emulsion Manual*

(2nd ed. n.d.) (Def. Ex. F) does not conflict with this definition.

can *Bitumuls & Asphalt Co. v. United States*, 45 Cust.Ct. 1, C.D. 2188, 185 F.Supp. 955 (1960). In that case the court found that asphalt mixed with twenty percent petroleum distillate (a so-called "cutback") was a form of asphalt. 45 Cust.Ct. at 4, 185 F.Supp. at 957–58. Like emulsifiers, the distillate or solvent was used to maintain the liquid form of the product. *Id.* The court recognizes a distinction between emulsifiers and distillates which aid application, combination, or transportation on one hand, and components with additional permanent functions, such as wax.

Of slightly more recent vintage than *Central Westrumite* is *Mariemont Co. v. United States*, T.D. 45,573, 61 Treas.Dec. 776 (1932). The product at issue in that case was asphalt in a liquid form, apparently an emulsion. The emulsion contained twenty percent "sodium soap." *Id.* at 780. The court made no mention in the discussion portion of the opinion of the sodium soap. It merely concluded that "the asphaltum is in a chemically unchanged state." *Id.* at 784. The product apparently was used, as asphalt is commonly, for making roads. *Id.* at 779. All evidence indicated that the government's original opinion that merchandise was "sulphonated bituminous pitch," which was not a paving material, was incorrect. *See id.* at 777. The court did not accept the government's argument that the presence of the sodium soap indicated an asphalt manufactured into something else. *See id.* at 780. Whether the sodium soap is an emulsifying agent or had other purposes was not explained. Evidence in this case, however, indicates that soaps were used as emulsifying agents in earlier asphalt products, *see A Basic Asphalt Emulsion Manual, supra*, at 11, and the *Mariemont* court treats the product at issue there as if the sodium soap is merely an enhancement of the asphalt product. *See Mariemont*, 61 Treas. Dec. at 784.

The clear similarity between *Mariemont* and the case at hand lies in the lack of chemical change to the asphalt and the presence of additional non-asphalt or water components. Because the sodium soap function is not discussed, it is difficult to apply the reasoning of *Mariemont* to the facts now before the court. *Mariemont*, however, cannot stand simply for the proposition that whenever no chemical change occurs in an asphalt containing emulsion, only a form of asphalt is present. Obviously, a product could be largely something other than asphalt without the asphalt component being chemically changed. *Mariemont* rather appears to be a case that states: it's not what the government thinks it is; and it looks, acts, and is used as asphalt is, therefore, it is asphalt. Thus, *Mariemont* is not particularly helpful to understanding the classification of asphalt-containing emulsions used in technically advanced applications.

Plaintiff relies, *inter alia*, on *Adolphe Hurst & Co., Inc. v. United States*, 33 CCPA 96, C.A.D. 322 (1946) to support its view that only a form of asphalt is at issue. *Hurst* dealt with improved, rather than "natural" or "crude," waxes. *Id.* at 100–03. The products at issue there contained more than natural wax, but were still marketed as "wax." *Id.* at 100–01. The court ruled that Congress did not limit the term "wax" to crude waxes only. *Id.* at 103. Obviously, the *Hurst* case allows the classification of advanced forms of products under broad *eo nomine* provisions. The court does not read *Hurst* to mandate classification according to the chief component of a product, here asphalt. The product at issue here is not asphalt, while the product at issue in *Hurst* was wax. Applicable definitions, plaintiff's own marketing, and simple chemical analysis indicate the product at issue is not merely a form of asphalt.

Although the opposite result obtained from a different set of facts, the reasoning of *Central Westrumite* provides the best guidance for resolution of this matter. That reasoning is also consistent with the various definitions submitted by the parties and the marketing of this product. The product at issue is more than a simple asphalt emulsion consisting of asphalt, water and emulsifiers which aid application of the asphalt. The product at issue is an asphalt-wax product with both the asphalt and wax performing important permanent

functions in the end use of the product. Accordingly, the court finds that plaintiff has not overcome the presumption of correctness applicable to defendant's classification and that defendant's view that the product is not simply an improved or advanced form of asphalt is sustained.

## JUDGMENT

This case having been submitted for decision and the Court, after deliberation, having rendered a decision therein; now, in conformity with that decision,

IT IS HEREBY ORDERED: that judgment is entered for defendant upholding its classification. Any duties outstanding on the covered entries shall be collected with interest as provided by law.